**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MILLENNIUM IP, INC. and MILLENNIUM MEDIA, INC.,

     Plaintiffs,                             Case No. 1:21-cv-0434

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

     Defendants.

## COMPLAINT

Plaintiffs, MILLENNIUM IP, INC. and MILLENNIUM MEDIA, INC. ("MILLENNIUM" or "Plaintiffs"), by their undersigned counsel, hereby complains of the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and for their Complaint hereby alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., the Federal Copyright Act, 17 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial Internet stores operating under the Defendant domain names and/or the online

marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant Aliases"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing infringing versions of Plaintiffs' trademark and copyrighted works. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing infringing versions of Plaintiffs' federally registered copyrighted works to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and have wrongfully caused Plaintiffs substantial injury in the State of Illinois.

3.       This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this Judicial District.

## INTRODUCTION

4.       Plaintiffs, Millennium IP, Inc. and Millennium Media, Inc., are the owners of the Copyright Registrations that protect the creative content of the Expendable films. Total production and advertising budgets for the Expendable Films exceeds $250 million.

5.       This action has been filed by Plaintiffs to combat online trademark and copyright infringers who trade upon Plaintiffs' reputation and goodwill and valuable trademark and copyrights by selling and/or offering for sale products, hereinafter referred to as the "EXPENDABLES Products" in connection with Plaintiffs' famous motion picture, "The Expendables." Given the success of the first film, subsequent films such as "The Expendables 2"

and "The Expendables 3" were made. In addition, the defendants are selling unauthorized products that are based on and derived from the copyrighted subject matter of the Expendable films, hereinafter referred to as the "Expendables Products." The tremendous notoriety and worldwide recognition of the EXPENDABLES trademark is due in part to the casts of the films which have included famous actors such as Sylvester Stallone, Jason Statham, Arnold Schwarzenegger, Mel Gibson, Harrison Ford, Wesley Snipes, Dolph Lundgren, Bruce Willis and Antonio Banderas among many others. The Expendables Films, all of which have been produced under the Millennium Films label of Millennium IP, Inc. and Millennium Media, Inc., have generated worldwide box office revenues in excess of $500 million.

6.     Plaintiffs are the owner of Copyright Registration Nos. PA 1-703-039; PA 1-810-290; PAu 3-734-299 (collectively, the "Expendables Works"); and the registrations are attached hereto as **<u>Exhibit 1</u>**. All of the copyrights have an effective date that predates defendants acts of copyright infringement.

7.     In an effort to illegally profit from the creative content of the Expendables Films and the trademark EXPENDABLES, Defendants have created numerous Defendant Internet Stores and design them to appear to be selling authorized Expendables Products.

8.     The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal operation. Plaintiffs are forced to file this action to combat Defendants' infringement. Plaintiffs have been and continue to be irreparably damaged through consumer confusion, dilution, loss of

control over the creative content and tarnishment of the valuable copyright as a result of Defendants' actions and seek injunctive and monetary relief.

9.      The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken since availing itself of takedown procedures to remove infringing products would be an ineffective and endless game of whack-a-mole against the mass counterfeiting that is occurring over the Internet. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed Plaintiffs and their ability to police their rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices below an original.

10.     To be able to offer the counterfeit products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
>                                          . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to

4

> manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 3**.

11.     The Defendant Aliases share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
>
> . . .
>
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.

. . .

Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

12.    eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform.  It formed a special task force that worked in conjunction with Chinese authorities for a boots-on the ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole                                    with                                    authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20          

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

See Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (**Exhibit 4**).

13.     Plaintiffs have been and continue to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and good-will as well as the quality of goods bearing the EXPENDABLES trademark and copyrights. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
>
> …
>
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer

enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020,

(**Exhibit 3**) at 4, 8, 11.

14.     Not only are the creators and brand holders harmed, the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.
The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3, 4. (Underlining in original).

15.     Plaintiffs' investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names by the

8

Defendant Internet Stores that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Plaintiffs products, while selling inferior imitations of Plaintiffs' products. The Defendant Aliases also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiffs is forced to file this action to combat Defendants' infringing of Plaintiffs' registered work, as well as to protect unknowing consumers from purchasing unauthorized EXPENDABLES products over the Internet.

16.     This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this Judicial District. In addition, each defendant has offered to sell and ship infringing products into this Judicial District.

## THE PLAINTIFFS

17.     Plaintiffs, Millennium IP, Inc. and Millennium Media, Inc., are the owners of the Copyright Registrations that protect the creative content of the Expendable films. Total production and advertising budgets for the Expendable Films exceeds $250 million:



18.     Plaintiffs are the owners of the United States Copyright Registrations that cover the "Expendables" motion pictures. The Registrations are valid, subsisting and in full force and effect. True and correct copies of the Registrations are attached hereto as Exhibit 1.

19.     In an effort to illegally profit from the creative content of the Expendable Films and the trademark EXPENDABLES, Defendants have created numerous Defendant Internet Stores and design them to appear to be selling authorized Expendables Products.

20.     MILLENNIUM has invested substantial time, money and effort in building up and developing consumer recognition, awareness, and goodwill in the EXPENDABLES Products.

21.     The success of the EXPENDABLES Products is due in large part to MILLENNIUM's marketing, promotional, and distribution efforts.

22.     Additionally, MILLENNIUM owes a substantial amount of the success of the EXPENDABLES Products to its licensees, consumers and interest that its consumers have generated.

23.     As a result of MILLENNIUM's efforts, the quality of its EXPENDABLES Products, the promotional efforts for its products and designs, press and media coverage, and members of the public have become familiar with EXPENDABLES Products, EXPENDABLES Works, and EXPENDABLES Trademark and associate them exclusively with MILLENNIUM. MILLENNIUM has acquired a valuable reputation and goodwill among the public as a result of such association.

24.     MILLENNIUM has made efforts to protect its interests in and to the EXPENDABLES Works and EXPENDABLES Trademark. No one other than MILLENNIUM and its licensees are authorized to manufacture, import, export, advertise, offer for sale, or sell any goods utilizing the EXPENDABLES Works or EXPENDABLES Trademark without the express written permission of MILLENNIUM.

## THE DEFENDANTS

25.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell illegal EXPENDABLES Products to consumers within the United States, including Illinois and in this Judicial District.

## THE DEFENDANTS' UNLAWFUL CONDUCT

26.     The success of the Expendable Films has resulted in significant copying of the creative content protected by the films' copyrights and infringement of the trademark EXPENDABLES.  Plaintiffs have identified numerous domain names linked to fully interactive websites and marketplace listings on platforms such as eBay, WISH, Amazon, Alibaba,

AliExpress, DHGate, etc. ("Infringing Websites" or "Infringing Webstores"). Each Defendant targets consumers in the United States, including the State of Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit products that violate Plaintiffs' intellectual property rights ("Counterfeit Products") to consumers within the United States, including the State of Illinois. Defendants have persisted in creating the Defendant Internet Stores. Internet websites like the Defendant Internet Stores are estimated to receive tens of millions of visits per year and to generate over $135 billion in annual online sales. According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2013 was over $1.74 billion, up from $1.26 billion in 2012. Internet websites like the Defendant Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year.

27.     The Defendant Aliases intentionally conceal their identities and the full scope of their counterfeiting operations in an effort to deter Plaintiffs from learning Defendants' true identities and the exact interworking of Defendants' illegal counterfeiting operations. Through their operation of the Infringing Webstores, Defendants are directly and personally contributing to, inducing and engaging in the sale of Counterfeit Products as alleged, often times as partners, co-conspirators and/or suppliers. Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products.

28.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiffs' ownership of the EXPENDABLES Trademark and

Works, including its exclusive right to use and license such intellectual property and the goodwill associated therewith.

29.    Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Aliases. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

30.    The counterfeit EXPENDABLES products for sale in the Defendant Aliases bear similarities and indicia of being related to one another, suggesting that the counterfeit EXPENDABLES products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Aliases also include other notable common features, including use of the user name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

31.    In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a

lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2012 U.S. Customs and Border Protection report on seizure statistics indicated that the Internet has fueled "explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.

32.     Further, counterfeiters such as Defendants, typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue operation in spite of Plaintiffs' enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

33.     Upon information and belief, Defendants also deceive unknowing consumers by using the EXPENDABLES trademark without authorization within the content, text, and/or meta tags of their websites to attract various search engines crawling the Internet looking for websites relevant to consumer searches for EXPENDABLES products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Aliases listings show up at or near the top of relevant search results and misdirect consumers searching for genuine EXPENDABLES products. Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.

34.     Defendants, without any authorization or license, have knowingly and willfully infringed the EXPENDABLES trademark and copyrights in connection with the advertisement, distribution, offering for sale, and sale of illegal products into the United States and Illinois over the Internet. Each Defendant Internet Store offers shipping to the United States, including Illinois, and, on information and belief, each Defendant has offered to sell infringing products into the United States, including Illinois.

35.     Defendants' use of the EXPENDABLES trademark in connection with the advertising, distribution, offering for sale, and sale of infringing products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

## COUNT I
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

36.     Plaintiffs repeat and incorporate by reference herein the allegations contained in the above paragraphs of this Complaint.

37.     Defendants' promotion, marketing, offering for sale, and sale of infringing Expendables Products has created and is creating a likelihood of confusion, mistake, and deception among the public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' infringing products by Plaintiffs.

38.     By using the EXPENDABLES trademark in connection with the sale of unauthorized products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the unauthorized products.

39.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the unauthorized products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

40.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

## COUNT II
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510, et seq.)

41.     Plaintiffs repeat and incorporate by reference herein the allegations contained in the above paragraphs of this Complaint.

42.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their unauthorized products as those of Plaintiffs, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine products, representing that their products have Plaintiffs' approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

43.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

44.     Plaintiffs have no adequate remedy at law, and Defendants' conduct has caused Plaintiffs to suffer damage to its reputation and goodwill. Unless enjoined by the Court, Plaintiffs will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## COUNT III
## COPYRIGHT INFRINGEMENT

45.     Plaintiffs repeat and incorporate by reference herein the allegations contained in the above paragraphs of this Complaint.

46.     The Expendable Films have significant value and have been produced and created at considerable expense.

47.     At all relevant times, Plaintiffs have been the holder of the pertinent exclusive rights infringed by Defendants, as alleged hereunder, including but not limited to the copyrighted Expendables Films, including derivative works.  The Expendables Films are the subject of valid Certificate of Copyright Registrations issued by the Register of Copyrights. (Exhibit 1).

48.     The copyrighted films include a copyright notice advising the viewer that the motion picture is protected by the Copyright Laws.

49.     Each Defendant, without the permission or consent of the Plaintiffs, has, and continues to sell online infringing derivative works of the copyrighted Expendables Films. Each Defendant has violated Plaintiffs' exclusive rights of reproduction and distribution. Each Defendant's actions constitute infringement of Plaintiffs' exclusive rights protected under the Copyright Act (17 U.S.C. §101 et seq.).

50.     The foregoing acts of infringement constitute a collective enterprise of shared, overlapping facts and have been willful, intentional, and in disregard of and with indifference to the rights of the Plaintiffs.

51.     As a result of each Defendant's infringement of Plaintiffs' exclusive rights under copyrights, Plaintiffs are entitled to relief pursuant to 17 U.S.C. §504 and to its attorneys' fees and costs pursuant to 17 U.S.C. §505.

52.     The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. §§502 and 503, Plaintiffs are entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiffs' copyright and ordering that each Defendant destroy all unauthorized copies.

## COUNT IV
## CIVIL CONSPIRACY

53.     Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

54.     Plaintiffs are informed and believe and thereon allege that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, a concerted and collaborated effort to maintain the distribution, marketing, advertising, shipping, offering for sale, or sale of Counterfeit and/orInfringing Products in  violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

55.     The intent, purpose and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine Plaintiffs and their business by unfairly competing against it as described above.

56.     The Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus, by entering into the conspiracy, each Defendant has deliberately, willfully and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

57. As a direct and proximate cause of the unlawful acts and misconduct undertaken by each Defendant in furtherance of the conspiracy, Plaintiffs have sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

a. using the EXPENDABLES trademark or any reproductions, copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not an authorized Expendables Product or is not authorized by Plaintiffs to be sold in connection with the EXPENDABLES trademark;

b. passing off, inducing, or enabling others to sell or pass off any product or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under the EXPENDABLES trademark;

d. further infringing the EXPENDABLES trademark and damaging Plaintiffs' goodwill;

e. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not authorized by Plaintiffs to be sold or offered for sale, and which bear the EXPENDABLES trademark or which are derived from Plaintiffs' copyright in the Expendables Films; and

    f.   using, linking to, transferring, selling, exercising control over, or otherwise owning the Online Marketplace Accounts, the Defendant Domain Names, or any other domain name or online marketplace account that is being used to sell products or inventory not authorized by Plaintiffs which bear the EXPENDABLES trademark or which are derived from Plaintiffs' copyright in the Expendables Films;

2)   Entry of an Order that, upon Plaintiffs' request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as eBay, Amazon, WISH, and Alibaba Group Holding Ltd., Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Domain Names, and domain name registrars, shall:

    a.   disable and cease providing services for any accounts through which Defendants engage in the sale of products not authorized by Plaintiffs which bear the EXPENDABLES trademark or which are derived from Plaintiffs' copyright in the Expendables Films, including any accounts associated with the Defendants listed on Schedule A;

    g.   disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of products not authorized by Plaintiffs which bear the EXPENDABLES trademark or which are derived from Plaintiffs' copyright in the Expendables Films; and

    h.   take all steps necessary to prevent links to the Defendant accounts identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant accounts from any search index; and

3) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) For Judgment in favor of Plaintiffs against Defendants that they have: a) willfully infringed Plaintiffs' rights in its federally registered copyright pursuant to 17 U.S.C. §501; and b) otherwise injured the business reputation and business of Plaintiffs by Defendants' acts and conduct set forth in this Complaint;

5) For Judgment in favor of Plaintiffs against Defendants for actual damages or statutory damages pursuant to 17 U.S.C. §504, at the election of Plaintiffs, in an amount to be determined at trial;

6) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.


DATED: January 26, 2021                    Respectfully submitted,

                                           */s/ Keith A. Vogt*
                                           Keith A. Vogt (Bar No. 6207971)
                                           Keith Vogt, Ltd.
                                           111 West Jackson Boulevard, Suite 1700
                                           Chicago, Illinois 60604
                                           Telephone: 312-675-6079
                                           E-mail: keith@vogtip.com

                                           **ATTORNEY FOR PLAINTIFFS**